[Cite as *Toledo v. Klink*, 2025-Ohio-2316.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


City of Toledo/State of Ohio                    Court of Appeals No.  L-24-1251
                                                                                        L-24-1252
       Appellee                                Trial Court No.  23 CRB 9484
                                                                                        23 CRB 11629
v.

Nicole Klink                                            **DECISION AND JUDGMENT**

       Appellant                              Decided: June 30, 2025

* * * * *

Rebecca Facey, City of Toledo Prosecuting Attorney,
and Jimmie Jones, Assistant Prosecuting Attorney, for appellee.

Autumn Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, following a bench trial, defendant-appellant,

Nicole Klink, appeals the October 3, 2024 judgment of the Toledo Municipal Court,

convicting her of two counts of domestic violence, one count of menacing, and one count of assault. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} On the night of September 28, 2023, Klink and her husband, M.K., had an argument that became violent. At the time, Klink's daughter and M.K.'s son, B.K., were also in the house. B.K. overheard the fight and called 911. When the police arrived, they spoke to everyone in the house and arrested Klink. After Klink's arrest, the police filed complaints that became the subject of two separate cases. In Toledo Municipal Court case No. CRB-23-09484, Klink was charged with domestic violence menacing, a violation of R.C. 2919.25(C), a fourth-degree misdemeanor, and menacing, a violation of R.C. 2903.22(A), a fourth-degree misdemeanor. In Toledo Municipal Court case No. CRB-23-11629, Klink was charged with domestic violence assault, a violation of R.C. 2919.25(A), a first-degree misdemeanor, and assault, a violation of R.C. 2903.13(A), a first-degree misdemeanor.

{¶ 3} Before trial, Klink filed a notice of self-defense under Crim.R. 12. The two cases were consolidated and tried together to the bench on February 8, 2024. At trial, the city presented evidence from M.K. and B.K. It also admitted into evidence a recording of the 911 call, a cell phone video, and body camera footage. Klink presented evidence from one of the arresting officers, Toledo Police Officer Daniel Wood. She also testified in her own defense.

2.

## A. The city's case

### 1. M.K's testimony

{¶ 4} M.K. testified that he and Klink argued for a long time on the night of September 28, 2023. Klink was particularly angry because her mother wanted restrictions on Klink's visits with Klink's son, so she had to go to court the following day. Klink blamed M.K. for her custody problems. M.K. also claimed that Klink had been drinking, which tended to make her "pretty aggressive."

{¶ 5} As the argument escalated, M.K. went upstairs to get away from Klink, but she followed him to their room. She hit him and threw things at him, including an ashtray, which hit him in the chest. To escape the attack, he went downstairs, but again, she followed. In the kitchen, she pulled out a drawer, which fell, and she grabbed something out of the drawer. As M.K. was leaving through the broken screen door, Klink "jab[bed]" through the hole in the door with an object that "sliced" his elbow. Later, she also bit him on the elbow. When the police arrived, but before they were in earshot, Klink threatened to stab M.K. again, which made him fear for his safety.

{¶ 6} M.K. denied that he physically attacked Klink, but he acknowledged that he did try to block her attacks. He claimed that he did nothing to provoke her and begged her to "knock it off."

{¶ 7} On cross-examination, M.K. denied drinking at all on September 28, 2023. He explained that the fight went on for hours because it would "stop and pick back up." M.K. claimed that he pulled out his phone during the fight and took a video of Klink

3.

because "usually, when I video, she stops and calms down." In the video, there are utensils on the floor and M.K. can clearly be heard saying "you're pulling knives and shit, bitch," screaming, and telling Klink to stop. When asked about his actions as shown in the video, M.K. denied following Klink. M.K. testified that the police had previously been called to the house for fights, but nobody had been arrested.

## 2. B.K's testimony and 911 call

{¶ 8} B.K. is M.K.'s 16-year-old son. He was in the house during the fight. From the time B.K. arrived at the house at around 4:00 or 5:00 p.m., he heard his father and Klink arguing "on and off" for hours. B.K. remained in his room the entire time. After he heard things being thrown and his father screaming what sounded like "stop stabbing me," B.K. called 911.

{¶ 9} A recording of the 911 call was entered into evidence. During the call, B.K. told the operator that he thought his stepmom stabbed his dad because he heard Klink opening the kitchen drawer, everything inside the drawer spilling out, and Klink chasing M.K. with a knife. He also told the operator that Klink had been drinking earlier. Screaming and shouting could be heard in the background of the 911 recording. B.K. denied hearing his father threaten Klink.

{¶ 10} On cross-examination, B.K. testified that he saw Klink drinking out of an "alcohol can" earlier that day, but he did not see his father drinking and denied that his father was intoxicated. B.K.'s bedroom was adjacent to his parents' room, so during the fight, he could hear objects smacking into the wall. He could also hear his father

4.

screaming after getting hit by thrown objects.  B.K. said that around 7:00 p.m., the argument had "calmed down" and he fell asleep.  He later woke up to the sounds of his father "trying to come out of the room" and "stuff just flying and smacking the wall."  B.K. acknowledged that the door to his room was closed, and he didn't see anything happen.  He also conceded that he did not see who started the altercation, but he said that it sounded like his dad was "on the defensive side."

{¶ 11} On redirect, B.K. testified that he did not see any injuries on his father.  He said that he did not hear his father make any threats toward Klink or say anything to provoke her.  On recross, he agreed with the suggestion that "something could have happened while [he] was asleep."

### 3. Body camera footage and police reports

{¶ 12} The city offered into evidence body camera footage from that night and the related police reports.

{¶ 13} The video shows police officers driving to Klink and M.K.'s house.  M.K. leaves the house as the officers enter, handcuff Klink, and remove her.  When the officer speaks to B.K., B.K. says that he heard Klink and M.K. arguing.  Then B.K. heard Klink throwing things, opening the drawer, and chasing M.K. with a knife.  B.K. stayed in his room throughout the fight.  When the officer speaks to M.K., he asks him about an injury on his left arm, and M.K. says that he went through the door.  As the police continue to question him, M.K. also says "it's not that serious" and "I don't have time for her to get in trouble."  The officers discuss the situation with each other and ultimately decide to

5.

arrest Klink for domestic violence menacing based on both children telling them they overheard Klink threaten to stab M.K. When the officers tell M.K. that Klink is being arrested, he becomes upset and clearly does not want her to be arrested. Likewise, when Klink is told she is being taken in, she says she didn't do anything.

{¶ 14} In the police report from September 28, 2023, Officers Trevino and Wood wrote that the two witnesses in the house (Klink and M.K.'s children) both heard M.K. telling Klink not to stab him, which prompted one of them to call the police. M.K. said he did not want anything done, Klink "denied anything occurred," and the officers believed that both were intoxicated due to drinking.

{¶ 15} According to a supplemental police report, M.K. went to the safety building later that night. He reported that he had been trying to sleep when Klink kicked him in his genitals. During the following fight, Klink bit him, poked him with a knife on his left elbow, and struck him on the right side. The officer who took the report observed "a bite mark on his left arm, a small cut on his left elbow[,] and minor swelling on the right side of his ribs." M.K. said that he did not report this to the officers at his home because he feared that Klink would retaliate against him or his son.

{¶ 16} Two police reports showed that on January 9, 2023, and August 20, 2023, police were called to Klink and M.K.'s home for domestic violence, but no arrests were made.

6.

{¶ 17} After admitting the body camera video and police reports into evidence, the city rested. Klink moved for acquittal under Crim.R. 29, on the basis that the city had not met its burden of proof. The court denied Klink's motion.

## B. Klink's case

### 1. Officer Wood's testimony

{¶ 18} Officer Daniel Wood testified on direct examination that he was one of several Toledo Police officers dispatched to the Klink household. When the officers arrived, they saw M.K. and Klink sitting on a couch. M.K. exited the house and told the officers that he "want[ed] nothing done." The officers interviewed M.K. and Klink separately. Officer Wood noted that they both appeared to be intoxicated. The officers searched the house. They did not find a knife or any other weapon, but they did see "a bunch of utensils everywhere" and "maybe a butter knife." Officer Wood acknowledged that the police report made no mention of weapons or injuries.

{¶ 19} On cross-examination, Officer Wood recalled Klink saying that she didn't know it was a crime "to talk crap to your husband." Officer Wood did not hear anyone state that M.K. had assaulted or threatened Klink. The court inquired of Officer Wood whether he inspected anyone for physical injuries, and he responded that they asked M.K. about "lacerations" visible on M.K.'s left elbow, but M.K. claimed that he got the injury from running into the door. Ultimately, Officer Wood said, the officers "came to the realization that we can't force someone to be a victim." They concluded that "it was mostly just AG [sic] menacing and DV threats." They arrested Klink.

7.

## 2. Klink's testimony

**{¶ 20}** Klink testified in her own defense. According to Klink, on September 28, 2023, she and M.K. began arguing in the afternoon. Both of them were drinking that day, but she denied that she was intoxicated. She was upset because "the house was a mess," she was working 60-hour weeks, she wanted M.K. to work on her car, he let the kids do "whatever," and she thought that he was having an affair. Once she had "said her peace [sic]," she went to bed. On direct examination, she testified that this was at around 9:00 p.m. On redirect, she testified that it was around 7:00 or 7:30 p.m.

**{¶ 21}** Later, M.K. woke Klink up, rubbing her back and wanting to have sex with her. When she said no and tried to leave the room, he said "we don't do this," meaning that the two of them should not sleep apart. He slammed her head into the wall and prevented her from leaving. In response, she threw things at him, including an ashtray and a lamp. She went downstairs, where he followed her through the house. At some point, M.K. stole her phone. When she got it back, it was "completely dead," so she could not call 911.

**{¶ 22}** Klink claimed that she only used violence to defend against M.K.; she did not hit or threaten him before he slammed her head into a wall, and she did not follow him around. She never had a knife and was never going to stab M.K. Klink claimed that M.K. did say that Klink was going to stab him, but only because he wanted their children to hear it. It was common for him to involve the children in their fights. Klink denied that M.K. had any injuries. When asked whether she had threatened M.K., Klink

8.

responded that she did not remember exactly what she said, but "he'd been talking in his sleep" and "there was a conversation that was held, between [them] prior to that, [but she] never threatened him."

{¶ 23} On cross-examination, Klink denied that there were utensils all over the kitchen floor, but she acknowledged that "the house was a mess." Upon questioning by the court, Klink testified that when the officers arrived, she did not tell them that M.K. had attacked her because she had to go to court the next day to fight for custody of her kids. She feared that reporting the attack would interfere with the custody case.

{¶ 24} After resting, Klink again moved for acquittal under Crim.R. 29, on the basis that the city had not met its burden of proof. The court again denied Klink's motion.

### C. The city's rebuttal

{¶ 25} The city asked to let M.K. testify in rebuttal, which the court allowed. On rebuttal, M.K. testified that Klink had been "on a binge" on September 28, 2023. He denied trying to have sex with Klink. He also explained that he initially did not tell the officers he had been attacked "because of my son." He worried that Klink would be angry with his son, a fear that later proved to be justified when she called him from jail, "mad" about "why she got caught." Later that night, after Klink had been arrested, he went to the safety building, reported the attack, and let them take pictures of his injuries.

## D. The trial court's verdict

{¶ 26} The trial court found Klink guilty of all counts. When it announced its verdict, the court said that it considered the evidence that could corroborate or contradict the parties' testimony. It gave the 911 recording heavy weight because at the time it occurred, B.K. had "no time to fabricate." On the call, B.K. said he could hear a kitchen drawer opening and all the utensils spilling out, which happened when his stepmother grabbed something from the drawer to attack his father. Body camera footage showed utensils on the ground, corroborating B.K.'s account on the 911 call. Additionally, officers saw lacerations on M.K.'s elbow, which corroborated his account of being cut with something sharp from the utensil drawer. Finally, the court noted that M.K.'s cellphone video showed him walking away from Klink.

{¶ 27} Regarding Klink's self-defense claim, the court said:

> I think the State has rebutted, beyond a reasonable doubt, your claim of self-defense. In that they have proven, beyond a reasonable doubt, that you did not have a reasonable fear of imminent harm. That the force used was not proportionate to the alleged force used against you. And that you were the initial aggressor.

{¶ 28} The trial court sentenced Klink to 20 days in jail for the domestic violence menacing conviction and 180 days in jail for the domestic violence assault conviction, but it referred her to the Regional Addiction Program and Intensive Supervised Probation. The remaining two counts merged for purposes of sentencing.

{¶ 29} Klink appealed. She assigns one error for our review:

10.

Klink had reasonable fear of danger to her body by M.K. as he followed Klink around the house rather than disengaging after he slammed her head into the wall.

## II. Law and Analysis

{¶ 30} Klink argues that the city failed to disprove her self-defense claim beyond a reasonable doubt. The city responds that it disproved Klink's self-defense claim beyond a reasonable doubt by providing evidence that Klink was the initial aggressor, therefore Klink's conviction was not against the manifest weight of the evidence.

{¶ 31} There are two types of self-defense in Ohio: (1) defense against danger of bodily harm, also known as non-deadly force self-defense, and (2) defense against danger of death or great bodily harm, also known as deadly force self-defense. *State v. Rice*, 2022-Ohio-3291, ¶ 58 (7th Dist.). Klink asserted the use of non-deadly force self-defense.

{¶ 32} In a case involving the use of non-deadly force, a defendant is justified in using force against another if "(1) [s]he was not at fault in creating the situation giving rise to the affray; (2) [s]he had reasonable grounds to believe [and] an honest belief that . . . [s]he is in imminent danger of bodily harm; and (3) [s]he did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm." (Internal quotations omitted.) *State v. Barnes*, 2025-Ohio-1684, ¶ 15 (6th Dist.). "Because each element must exist for a self-defense claim to prevail, the state can defeat a self-defense claim by disproving any one of these elements beyond a reasonable doubt." *State v. Knuff*, 2024-Ohio-902, ¶ 191.

11.

**{¶ 33}** In *State v. Messenger*, 2022-Ohio-4562, the Ohio Supreme Court clarified the burden of proof in a self-defense case under the current version of R.C. 2901.05(B)(1). First, the defendant must present evidence "that tends to support that the accused person used the force in self-defense." R.C. 2901.05(B)(1). The language of the statute indicates that "the defendant's burden of production is not a heavy one." *Messenger* at ¶ 22. As such, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the State must then disprove at least one element of self-defense. *Id.* In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26.

**{¶ 34}** Here, Klink produced sufficient evidence, by way of her own testimony, that tended to show that she acted in self-defense when she assaulted M.K. This shifted the burden to the city to disprove self-defense beyond a reasonable doubt. The court found that the city met its burden. Specifically, it found that the city had proven beyond a reasonable doubt that Klink was the initial aggressor, she did not have a reasonable fear of imminent harm, and the force used was not proportionate to the alleged force used

12.

against her. We must, therefore, consider whether the court's findings were against the manifest weight of the evidence.

{¶ 35} In evaluating a manifest weight challenge involving self-defense, we must review the entire record, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the city disproved at least one of the elements of self-defense beyond a reasonable doubt. *State v. Gibson*, 2023-Ohio-1640, ¶ 12 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the fact-finder's credibility determinations, given that it is the fact-finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 36} Because it is dispositive of Klink's self-defense claim, we will confine our analysis to the first element of self-defense, i.e. whether Klink was the initial aggressor. "The 'not at fault' requirement . . . means that the defendant must not have been the first aggressor in the incident." *State v. Mitchell*, 2023-Ohio-2604, ¶ 19 (1st Dist.), quoting *State v. Turner*, 2007-Ohio-1346, ¶ 23 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979).

{¶ 37} Here, Klink argues that she was not the initial aggressor. She insists that the victim was the initial aggressor because he woke her up, slammed her head into the

13.

wall, and followed her around the house, "thereby continuing to be a threat to Klink." However, the record contains other evidence from the city, namely testimony from the victim and a contemporaneous phone video taken by the victim, that supports a different account of events. According to the city, M.K. was moving away from Klink, giving Klink the opportunity to safely leave the situation, but Klink followed him and stabbed him with a knife.

{¶ 38} After hearing the evidence, the trial court found the city's version of events more credible. Indeed, it specifically said that "based on the totality of the circumstances, the victim's testimony, the witnesses' testimony, what the officer saw, the video and the 911 call, I cannot say that [Klink was] not the initial aggressor." Nothing in the record shows that the court erred in its credibility assessment. The trial court's rejection of Klink's self-defense claim is not against the manifest weight of the evidence simply because the fact-finder believed the testimony and evidence presented by the city. *State v. Dorsey*, 2025-Ohio-1129, ¶ 35 (9th Dist.) (Internal citations omitted.) ("[T]his Court will not overturn the trial court's verdict on a manifest weight challenge simply because the jury chose to believe the testimony of certain witnesses and not others.").

{¶ 39} After carefully reviewing the record, we are not convinced that this is an exceptional case in which the evidence weighs heavily against conviction. The trial court's rejection of Klink's self-defense claim was not against the manifest weight of the evidence because, based upon the testimony and evidence presented, a reasonable fact-finder could have determined that Klink was the initial aggressor. Because the city was

14.

required to disprove only one of the three elements of self-defense to defeat Klink's self-defense claim, *Knuff*, 2024-Ohio-902, at ¶ 191, we need not consider the other two elements. *Id.* at ¶ 196. We find Klink's sole assignment of error not well-taken.

### III. Conclusion

{¶ 40} After reviewing the entire record, we conclude that the trial court did not clearly lose its way or create a manifest miscarriage of justice when it found that Klink was the initial aggressor here. As such, the city proved beyond a reasonable doubt that Klink did not act in self-defense. Accordingly, we find Klink's assignment of error not well-taken, and we affirm the October 3, 2024 judgment of the Toledo Municipal Court. Klink is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Thomas J. Osowik, J. | |
| | JUDGE |
| Christine E. Mayle, J. | |
| | JUDGE |
| Myron C. Duhart, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.